JUSTICE NELSON,
dissenting.
¶23 I dissent from the Court’s denial of attorneys’ fees under the private attorney general doctrine. I believe the Court errs in three respects.
¶24 First, the District Court provided two distinct analyses of ATP’s two distinct theories for seeking attorneys’ fees: one under the private attorney general doctrine and the other under the Uniform Declaratory Judgments Act (§ 27-8-313, MCA). This Court provides zero analysis of the District Court’s actual decision under the private attorney general doctrine. Moreover, the Court fails to conduct its own distinct analysis under this doctrine pursuant to the three Montrust factors. See Opinion, ¶ 14; Montanans for the Responsible Use of the Sch. Trust v. State ex rel. Bd. of Land Commrs. (Montrust), 1999 MT 263, ¶ 67, 296 Mont. 402, 989 P.2d 800. Instead, the Court merges the private attorney general analysis into the Uniform Declaratory Judgments Act analysis and thereby creates a sort of one-size-fits-all procedural “smoothie” for analyzing attorneys’ fees requests under these two distinct doctrines.
¶25 Second, the Court further confuses matters by injecting § 25-10-711, MCA, into this case. That statute provides an independent basis for an award of attorneys’ fees. It states:
(1) In any civil action brought by or against the state, a political subdivision, or an agency of the state or a political subdivision, the opposing party, whether plaintiff or defendant, is entitled to the costs enumerated in 25-10-201 and reasonable attorney fees as determined by the court if:
(a) the opposing party prevails against the state, political subdivision, or agency; and
(b) the court finds that the claim or defense of the state, *121 political subdivision, or agency that brought or defended the action was frivolous or pursued in bad faith.
(2) Costs may be granted pursuant to subsection (1) notwithstanding any other provision of the law to the contrary.
Section 25-10-711, MCA. If ATP had sought an award of attorneys’ fees pursuant to this provision, then ATP would have been required to show (a) that it prevailed against the State and (b) that the State’s defense was “frivolous or pursued in bad faith.” What the Court apparently fails to appreciate, however, is the fact that ATP did not seek an award of attorneys’ fees based on this statute. ATP relied, rather, on the private attorney general doctrine and the Uniform Declaratory Judgments Act. Hence, ATP was not required to show that the State’s defense was “frivolous or pursued in bad faith.” It was required, rather, to establish the elements of the two doctrines upon which it relied.
¶26 Notably, the district court in Montrust denied an award of attorneys’ fees under § 25-10-711, MCA, because the action involved “neither frivolous conduct, extreme conduct, nor bad faith by the State.” Montrust, ¶ 60. On appeal, the State asserted the very proposition stated at ¶ 10 of today’s Opinion-namely, that a prevailing party may recover attorneys’ fees against the State only if the court finds that the claim or defense of the State was frivolous or pursued in bad faith. See Montrust, ¶ 63. In other words, the State suggested that § 25-10-711, MCA, is a blanket limitation on an award of attorneys’ fees against the State under any theory-what the Court effectively holds in today’s decision. The statute contains no such language, however, and we therefore rejected the State’s proposition and instead adopted the private attorney general doctrine as a theory of recovery distinct from the entitlement to, and limitations on, an award of attorneys’ fees under § 25-10-711, MCA. See Montrust, ¶¶ 64-67. We concluded that Montrust was entitled to attorneys’ fees under the private attorney general theory, regardless of the district court’s determination that the action involved “neither frivolous conduct, extreme conduct, nor bad faith by the State.” Montrust, ¶¶ 60, 69. The Court’s contrary approach in its decision today throws this entire area of law into a state of utter disarray.
¶27 Third, the Court denies relief under ATP’s private attorney general theory based entirely on a sentence in the District Court’s order that was not part of the District Court’s reasoning under that theory. Specifically, the District Court observed that “[t]he State’s arguments were made in good faith and were supported by briefs that *122 were meticulously researched, well written, and well argued.” This statement might be relevant if ATP were pursuing a claim for attorneys’ fees under § 25-10-711, MCA. ATP is not relying on this statute, however, as noted above. Furthermore, the District Court provided the foregoing quoted statement as its rationale for concluding that an award of attorneys’ fees was not proper under ATP’s Uniform Declaratory Judgments Act theory. The District Court provided an entirely separate analysis of the private attorney general theory, this Court simply chooses not to address the District Court’s specific reasoning under that theory.
¶28 In short, and with due respect, I believe it is wrong-not to mention patently unfair-for this Court to reject ATP’s argument for attorneys’ fees based on the criteria of a statute (§ 25-10-711, MCA) that ATP never even invoked. Cf. Western Sec. Bank v. Eide Bailly LLP, 2010 MT 291, ¶¶ 73, 81, 359 Mont. 34, 249 P.3d 35 (Nelson, J., concurring in part and dissenting in part) (“It will surely come as a surprise to Glacier, however, when it learns that it has lost this case because it failed to adequately support a claim that it never even raised! ... It is unfair to remake a plaintiffs cause of action into something it never was intended to be and then to deny the plaintiff relief for failing to adequately support this remade cause.”). The Court completely muddles this area of law by blending the private attorney general doctrine and the Uniform Declaratory Judgments Act doctrine into a single analysis and then superimposing on that analysis the “frivolous or pursued in bad faith” criterion of § 25-10-711, MCA-contrary to our approach in Montrust. With this Opinion, we have effectively done away with the private attorney general doctrine. Like the majority of the United States Supreme Court in Citizens United v. FEC, 558 U.S. 310, 130 S. Ct. 876 (2010), this Court has now remade this case so as to remake the law pertaining to the private attorney general doctrine.
¶29 For the reasons which follow, I conclude and would hold that ATP is entitled to an award of attorneys’ fees under a proper application of the criteria of the private attorney general doctrine, as set forth in Montrust. !
The Private Attorney General Doctrine
¶30 This Court adopted the private attorney general doctrine in Montrust, ¶ 67. There are three factors to be considered in awarding attorneys’ fees under this doctrine: (1) the strength or societal importance of the public policy vindicated by the litigation, (2) the *123 necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, and (3) the number of people standing to benefit from the decision. Montrust, ¶ 66 (citing Serrano v. Priest, 569 P.2d 1303, 1314 (Cal. 1977)).
¶31 In the present case, the District Court concluded under the first factor that the issues here are clearly very important. Second, the District Court reasoned that because the Attorney General is required to defend the statute in question, private enforcement of the important constitutional rights at issue was required. Third, however, although the District Court had ruled in favor of ATP on the merits of its constitutional claim, the court opined that “there is no reasonable way of knowing ‘the number of people’ standing to benefit from this decision” (emphasis in original). For this latter reason, the District Court denied an award of attorneys’ fees under the private attorney general doctrine.
¶32 While I agree with the District Court’s analysis as to the first factor, and agree with the District Court’s ultimate conclusion under the second factor, I do not agree with the District Court’s reasoning regarding the third factor. In my view, ATP has successfully answered all three factors. I address each one in turn.
Factor 1
¶33 First, as to the strength or societal importance of the public policy vindicated by the litigation, it is hardly open to argument that ATP’s lawsuit secured against the proscriptions of Montana’s Corrupt Practices Act (in particular, § 13-35-227, MCA) the expansive right of corporations and associations-as decreed by the United States Supreme Court under the First Amendment in Citizens United-to use general treasury funds to make independent expenditures expressly advocating the election or defeat of candidates. Absent this challenge, corporations and associations remained constrained and inhibited from making such independent expenditures in support of or against candidates in Montana. Moreover, as the Ninth Circuit has recently held, the loss of such First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury. Sanders County Republican Cent. Comm. v. Bullock, 698 F.3d 741, 748 (9th Cir. 2012).
Factor 2
¶34 Second, as to the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, the Attorney General’s decision to defend the Corrupt Practices Act left ATP with no choice but to litigate its rights under Citizens United. Indeed, ATP took on the burden of vindicating the First Amendment rights of every *124 corporation, association, and person[1] in the State of Montana.
¶35 In this regard, I note my disagreement with the District Court’s reasoning that this is a case in which the Attorney General was “required to defend the statute.” I appreciate that it is the Attorney General’s duty, generally, to defend the State and argue the validity of state statutes against attack. See § 2-15-501, MCA. However, as the Court points out, the Attorney General has discretion in this regard and has even conceded that a challenged statute was unconstitutional. Opinion, ¶ 17; In re W.C., 206 Mont. 432, 439, 671 P.2d 621, 624 (1983); Associated Press v. State, 250 Mont. 299, 300, 820 P.2d 421, 422 (1991). In the present case, given the clarity and breadth of the Citizens United decision and the fact that the Supreme Court in Citizens United rejected every one-not just some, but all-of the arguments for upholding § 13-35-227, MCA,[2] I cannot understand how, much less agree with the proposition that, the Attorney General had any substantial grounds to defend the statute against ATP’s challenge. Nor can I agree with the Court’s suggestion that ATP’s challenge was brought in a time of “shifting legal landscapes.” Opinion, ¶ 20. The Supreme Court was very clear as to the breadth of its holding in Citizens United. The Attorney General, like other elected officials of this State, takes an oath to “support, protect and defend the constitution of the United States ....” Mont. Const. art. Ill, § 3. The Constitution of the United States, as interpreted by the Supreme Court in Citizens United, is “the supreme Law of the Land ..., any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” U.S. Const, art. VI, cl. 2.1 am not going to repeat my analysis in Western Tradition Partn., Inc. v. Atty. Gen. of Montana, 2011 MT 328, ¶¶ 61-135, 363 Mont. 220, 271 P.3d 1 (Nelson, J., dissenting). Suffice it to say that, in my view, such analysis could just as easily have been undertaken and adopted by the Attorney General (as a host of other state attorneys general did), with the result that ATP’s litigation in the District Court would not have been necessary, ATP’s appeal to this Court would not have been necessary, and ATP’s appeal to the Supreme Court of the United States would not have been *125 necessary.
¶36 In any event, the important point is that the Attorney General’s decision to defend the law made it necessary for ATP to enforce its rights under Citizens United. As for the magnitude of the resultant burden on the plaintiff, the State contends that ATP’s burden was negligible because ATP’s attorneys “litigated this case only minimally. Plaintiffs conducted no discovery, swore out a couple of bare-bones affidavits, and in their two summary judgment briefs below made no legal arguments not already contained within the Citizens United opinion itself.” According to the State, “[t]his is far from the typical case of private attorney general doctrine fee awards, which involves ‘significant legal costs’ resulting from extensive discovery, expert testimony, and often trial.”
¶37 There are two flaws in the State’s argument. First, the magnitude of the resultant burden on the plaintiff must be considered in relative terms. Here, the burden on ATP was significant if one considers that ATP should not have been forced to pursue this action in the first place. According to the Supreme Court, the Attorney General’s arguments for upholding § 13-35-227(1), MCA, “either were already rejected in Citizens United, or fail to meaningfully distinguish that case.” Am. Tradition, 132 S. Ct. at 2491. Yet, despite the clarity and breadth of the Citizens United decision, the Attorney General took the position that Montana’s ban on independent expenditures is constitutional and enforceable. Regardless of the Attorney General’s rationale behind this decision, the undisputed result was that ATP had to incur the burden of litigating its rights-not only in the District Court, but also in appeals to this Court and the Supreme Court-against arguments that “either were already rejected in Citizens United, or fail to meaningfully distinguish that case.” Am. Tradition, 132 S. Ct. at 2491. In my view, given these facts, the magnitude of the burden was great.
¶38 Second, even assuming, for the sake of argument, that ATP’s burden was “minimal,” adopting the State’s approach would give plaintiffs in these sorts of cases an incentive to run up “significant legal costs”-even if the costs are unnecessary-in order to strengthen their claim for attorneys’ fees under the private attorney general doctrine. In a case, such as the present one, which otherwise qualifies under that doctrine, the plaintiff should not be penalized for failing to incur “significant legal costs” in the process. It is truly ironic that the State is here complaining that ATP’s legal bills are not high enough. Such an approach to the private attorney general doctrine would not *126 be in the taxpayers’ best interests.
¶39 For the foregoing reasons, I would hold that the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff weigh in ATP’s favor. The Supreme Court spoke unequivocally in Citizens United; Montana chose to challenge the application of Citizens United to Montana; and, predictably, Montana lost. Montana should not now be heard to argue that ATP is not entitled to its attorneys’ fees for successfully litigating a case that, in my view, ATP should not have been forced to litigate in the first place.
Factor 3
¶40 Finally, the third factor concerns the number of people standing to benefit from the decision. There is no question that every corporation and association in Montana-and, due to ATP’s appeal to the Supreme Court, every corporation and association in the United States-benefited from ATP’s filing and pursuance of this litigation. As a result of the instant lawsuit, each corporation and association has been guaranteed the ability to exercise, at the state level, the rights decreed in Citizens United, given that the Supreme Court’s reversal of this Court’s decision removed any lingering doubt-implausible as that doubt may have been[3]-about whether the application of Citizens United was limited to federal elections. See Am. Tradition, 132 S. Ct. at 2491 (“The question presented in this case is whether the holding of Citizens United applies to the Montana state law. There can be no serious doubt that it does.” (citing the Supremacy clause, U.S. Const., art. VI, cl. 2)).
¶41 As noted, the District Court concluded that the third factor was not met because “there is no reasonable way of knowing ‘the number of people’ standing to benefit” from the District Court’s ruling in favor of ATP on the merits of its constitutional claim (emphasis in original). The District Court, however, cited no authority for its apparent premise that the term “people” in Montrust’s third factor is limited to human beings. The District Court, it appears, simply assumed this to be true without analysis.
¶42 Setting aside the controversial question whether corporations and associations are “persons,” however, the District Court overlooked a fundamental point of the Citizens United decision. As I recently *127 discussed in Montanans Opposed to I-166 v. Bullock, 2012 MT 168, ¶¶ 20-25, 365 Mont. 520, 285 P.3d 435 (Nelson, J., dissenting), Citizens United was not just about the rights of corporations and associations to speak. More importantly, it was about the rights of citizens to hear and obtain information about candidates from diverse sources without governmental censorship. Indeed, the Citizens United decision rested on two propositions: first, that expenditures (by a person or an organization) on political communication are a form of “speech”; and second, that “citizens [have the right] to inquire, to hear, to speak, and to use information to reach consensus.” Citizens United, 130 S. Ct. at 898 (emphasis added). These propositions were not created in Citizens United. Rather, they can be traced to Buckley v. Valeo, 424 U.S. 1, 96 S. Ct. 612 (1976) (per curiam), and First Natl. Bank v. Bellotti, 435 U.S. 765, 98 S. Ct. 1407 (1978).
¶43 Of particular significance to the present discussion, the Supreme Court observed in Bellotti that
[t]he court below framed the principal question in this case as whether and to what extent corporations have First Amendment rights. We believe that the court posed the wrong question. The Constitution often protects interests broader than those of the party seeking their vindication. The First Amendment, in particular, serves significant societal interests. The proper question therefore is not whether corporations “have” First Amendment rights and, if so, whether they are coextensive with those of natural persons. Instead, the question must be whether [the state statute at issue] abridges expression that the First Amendment was meant to protect.
435 U.S. at 775-76, 98 S. Ct. at 1415 (emphasis added). The Bellotti Court stated further that “[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual,” 435 U.S. at 777, 98 S. Ct. at 1416, and that “the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw,” 435 U.S. at 783, 98 S. Ct. at 1419 (emphasis added).
¶44 Likewise, the Supreme Court stated in Citizens United that “it is inherent in the nature of the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes” and that the First Amendment does not allow “the exclusion of a class of speakers from the general public dialogue.” 130 *128 S. Ct. at 899 (emphases added). The Supreme Court observed that the First Amendment protects the “open marketplace” of ideas, Citizens United, 130 S. Ct. at 899, and prohibits restrictions on political speech based on the speaker’s identity, Citizens United, 130 S. Ct. at 902-03. Because voters must be free to obtain information from diverse sources, it is a violation of the First Amendment to control expression by distinguishing among different speakers and the subjects upon which they may speak. Citizens United, 130 S. Ct. at 898-99. The Supreme Court held that this country’s law and tradition require more expression, not less, Citizens United, 130 S. Ct. at 911, and that “[w]hen Government seeks to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought,” Citizens United, 130 S. Ct. at 908 (emphasis added).
¶45 Clearly, then, the constitutional rights protected by the Citizens United decision are not just those of corporations; they are those of “people.” And the District Court was clearly wrong, therefore, in suggesting that “people” do not stand to benefit from the District Court’s decision in favor of ATP or that there is no reasonable way of knowing “the number” of people standing to benefit from that decision. As a matter of federal constitutional law, all Montana citizens-at least, every voter in Montana-benefitted from the District Court’s decision in favor of ATP under Citizens United. By virtue of the District Court’s decision, which the Supreme Court has now tacitly affirmed, the State of Montana may not “use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear.” Citizens United, 130 S. Ct. at 908. The State no longer may “limit[ ] the stock of information from which members of the public may draw” when making their electoral decisions. Bellotti, 435 U.S. at 783, 98 S. Ct. at 1419. ATP’s successful lawsuit vindicated not only the rights of corporations and associations to make independent expenditures in support of or against candidates, but also the First Amendment rights of the “people” of Montana to receive information about candidates from diverse sources without governmental censorship.[4]
*129 CONCLUSION
¶46 Based on the foregoing analysis, I conclude that the private attorney general doctrine applies to ATP’s lawsuit. Accordingly, I would reverse the District Court’s denial of attorneys’ fees. I would remand for a factual determination of ATP’s attorneys’ fees and for the entry of judgment in ATP’s favor and against the State. I disagree with this Court’s contrary decision.
¶47 I dissent.

I use the term “person” here deliberately, for reasons explained under the third factor.

 See Am. Tradition Partn. v. Bullock,_U.S._, 132 S. Ct. 2490, 2491 (2012) (per curiam) (“Montana’s arguments in support of the judgment below either were already rejected in Citizens United,, or fail to meaningfully distinguish that case.”).

 See Citizens United, 130 S. Ct. at 903 (noting that a state ban on corporate independent expenditures would be unconstitutional under the longstanding principle that “the First Amendment does not allow political speech restrictions based on a speaker’s corporate identity”).

 While I accept, and agree with, the principle that the government does not have the power “to command where a person may get his or her information or what distrusted source he or she may not hear,” Citizens United, 130 S. Ct. at 908, I still have concerns about the ability of corporations, associations, and those with extreme wealth to drown out other voices. Western Tradition, ¶ 127 (Nelson, J., dissenting). In my view, *129 the protections of the First Amendment, as with other constitutional provisions, ought to be balanced. Western Tradition, ¶ 130 (Nelson, J., dissenting). In this respect, while all speakers-corporations, associations, and individuals alike-have the right to contribute to the “open marketplace” of ideas, Citizens United, 130 S. Ct. at 899, no one contributor should be able to monopolize the marketplace to the exclusion of other potential contributors. There can be no open exchange of ideas and debate if some of the parties to the conversation cannot afford to get a word in edgewise.